# EXHIBIT 6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CERTIFIED COPY**

```
THESE PONIES ARE MISERABLE,   )
an unincorporated             )
association, et al.,          )
                              ) CASE NO.
        Plaintiffs,           ) 2:23-CV-8330-HDV-SK
                              )
vs.                           ) RELATED TO CASE NO.
                              ) 2:21-CV-09653
CITY OF LOS ANGELES, et al.,  )
                              )
        Defendants.           )
_____)
```

DEPOSITION OF PETER LECKI

Los Angeles, California

Monday, May 5, 2025

Reported by:

STEPHANIE NELSON,
CSR No. 14778

Job No.:
54878CAT

**Exhibit 6-1**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

THESE PONIES ARE MISERABLE,  )
an unincorporated            )
association, et al.,         )
                             ) CASE NO.
        Plaintiffs,          ) 2:23-CV-8330-HDV-SK
                             )
vs.                          ) RELATED TO CASE NO.
                             ) 2:21-CV-09653
CITY OF LOS ANGELES, et al., )
                             )
        Defendants.          )
_____)

DEPOSITION OF PETER LECKI, taken at

200 North Main Street, Los Angeles, California,

commencing at 9:45 a.m. and concluding at 3:55 p.m.

on Monday, May 5, 2025, reported by Stephanie Nelson,

CSR No. 14778, a Certified Shorthand Reporter

in and for the State of California.

**Exhibit 6-2**

PONIES V COLA                                                LECKI, P

APPEARANCES:


FOR THE PLAINTIFF PETER LECKI:

          JEROLD D. FRIEDMAN
          LAW OFFICE OF JEROLD D. FRIEDMAN
          444 W. OCEAN BLVD., SUITE 800
          LONG BEACH, CA 90802
          (213) 536-1244
          JERRY@LAWOFFICEJDF.COM


FOR THE CITY OF LOS ANGELES:

          JOSEPH S. PERSOFF
          DEPUTY CITY ATTORNEY
          200 NORTH MAIN STREET, 6TH FLOOR
          CITY HALL EAST
          LOS ANGELES, CA 90012
          (213) 978-7560
          JOSEPH.PERSOFF@LACITY.ORG


ALSO PRESENT:

          CARR TEKOSKY
          DEPUTY CITY ATTORNEY

          JUSTIN GRAMS
          OBSERVER

          MEGAN SWARTZ
          PARALEGAL

**Exhibit 6-3**

A.    About a year-and-a-half, almost two.  Yeah.

Q.    And where did you live before that?

A.    A Los Angeles in Hollywood.

Q.    And how long did you live there?

A.    For five years.

Q.    So you moved to Los Angeles in about 2019; is that correct?

A.    Gosh.  I don't recall exactly.  I don't recall exactly.

Q.    Okay.  And where did you live before moving to Hollywood?

A.    In Reseda.

Q.    Okay.  And how long did you live there?

A.    Less than a year.

Q.    And where before Reseda?

A.    In Orange County.

Q.    And about how long did you live there?

A.    Most of my life.

Q.    Okay.  So that takes us back a while.  Have you been a party to a lawsuit other than this one?

A.    Small claims, but not lawsuit, no.

Q.    So in that small claims case, can you tell me about that, please?

A.    Yeah.  One -- my last one when I was living in Santa Ana, I had a -- a custom thermostat with, like, a

**Exhibit 6-4**

schedule stuff, you know, temperature changes and what not.  And at some point, the complex came in and started replacing all of them across the board.  I said, "Hey, don't do mine because it's custom.  The one that you had it sitting on the table."  But they replaced mine anyway, and I just wanted a back, but I didn't get it back.

Q.  Got it.  And did you provide any testimony in that case?

A.  It was small claims.

Q.  Go it.  And so -- and you brought that lawsuit?

A.  Yes.

Q.  And so there haven't been any other lawsuits that you've brought?

A.  Yes, there was.  Oh, actually, it was after that when I was living in Reseda.  The wall that was dividing our property with the neighbors fell down.  The entire wall fell down.  We told them about it, and they were like, "Yeah.  Okay.  We'll take care of it."  And one week went by, and two weeks, and the three weeks, nothing was done.  And then eventually, I had a -- a barbecue unit and a little heat lamp, and that disappeared.  So I took them to small claims to try to get that back, but did not.

Q.  Okay.  Any other cases that you brought as a

**Exhibit 6-5**

plaintiff?

A.   Let's see.  Yes.  When I was moving from Anaheim, I wanted to -- I needed to leave Anaheim because my new job was in Huntington Beach, so I wanted to move to Newport, and I -- I signed the lease and all that.  I signed the lease.  I paid a deposit for the place, and then at the very last minute, you know, I was already packed up and stuff -- was I packed up?  I remember if I was packed up or not.  Then they said, "Oh, hey.  That unit that you were going to get, the carpet one" --  I have dogs, so I prefer carpet so they can move around better.

They said "Oh, yeah.  That unit is no longer available.  We have a -- a nice a newer one with smooth flooring."  Well, that's not exactly what I wanted.  So they said, "Well, I could give you another one, but that's, like, $1000 more" or whatever, right?  So I said, "Okay.  Never mind on that.  Give me my money back."  And they were like, "No, because you already signed the lease."  And I was like, "Well, I signed the lease for that amount," and long story short, they wouldn't -- they wouldn't budge, so I take them to small claims, and I said, "Hey.  They did all this and now my existing apartment" - because I was out of lease already, "they charged me $1000 more because it was

**Exhibit 6-6**

month-to-month," or whatever, instead of a lease.

So I wanted that money back because I was supposed to be out of that place already.  Like, I already planned the whole thing, right?  And so now I had to pay $1000 more because I didn't have the place I was going to move into.  I had to put $1000 more for this place.  So I said, "Well, it's not really my fault."  So I wanted that money back from that place that -- that messed up the apartment thing.  So I took them to small claims, and I did win that one.

Q.  Got it.  Any other claims that you brought?  Any lawsuits that you brought?

A.  I don't recall anything else.

Q.  Okay.  And have there been any cases where you've been a defendant?

A.  Yes.  The city of Los Angeles.  In this -- this particular campaign that we're talking about, right?  So I was charged with a bunch of stuff.  Eventually it was all dismissed, but I was a defendant in that case, yes.

Q.  Got it.  And any others?

A.  No.  I don't think so.  I don't recall anything else.

Q.  Did you bring a lawsuit against the company called Firm Tofu, LLC.

A.  Oh, yes, I did.  Yes.  Yes.  Yes.  Yes.

**Exhibit 6-7**

remember how I met this person, how she even -- how we got in touch.  I do not recall this.

Q.  Might you have -- she have sent you a text position?

A.  She might have, but once again, I don't recall how we would have exchanged contact information, like how we became in touch.  I do not recall.

Q.  Do you currently have her cell phone number?

A.  I probably have one that she had at some point. I don't know if it's active still, but at one point I did have her -- her current phone number, yes.

Q.  And you have texted with her?

A.  Probably over a texting platform like Signal. Probably not over SMS, although that might be the case. I don't recall.

Q.  So is Signal something that you commonly use?

A.  Yes.

Q.  And you used that with the Griffith Park protests.

A.  Yes.

Q.  And was it just you and Zohra on that chat or were there others as well?

A.  Well, I would communicate with people individually, but there was a group chat as well.

Q.  And who else was on that group chat?

**Exhibit 6-8**

A.   Most, if not all, the other plaintiffs.

Q.   And what sort of things would you discuss in that group chat?

A.   Mostly times and locations of the next -- so after -- initially, it was times and locations for protesting at the park, and then the -- when we got kicked out of the park by the Rec and Parks Department, then we started protesting at other locations.  So it was basically just -- mostly location that times of protests.

Q.   And do you still have access to that chat?

A.   Yes.

Q.   So when did you first protest at the Griffith Park Pony Rides?

A.   I -- gosh.  I want to say '21.

Q.   Well, let me ask this question --

A.   Yes.

Q.   If I recall correctly, the first alleged date in the complaint is October 3, 2021.

A.   Okay.

Q.   Did you attend a protest prior to then?

A.   I don't recall.

Q.   The first time you attended a protest at the Griffith Park Pony Rides were you arrested?

A.   I don't remember if it was the first -- the very

**Exhibit 6-9**

contract, then we -- it was a final -- it was the very final day of anybody being out there, and we had -- so there were counter -- protestors then.  They were saying, "Keep this park open," but we were saying, you know, "keep this facility open."  We were saying, "Close the facility."  So we did have counter -- it was just one time.

Q.  Got it.  So going back to you were talking about your style versus Zohra's.  Would you say yours was more confrontational?

A.  Yes.

Q.  And can you tell me more about that.

A.  Well, it's because -- I would say it's more confrontational to have someone say -- may I elevate my voice here, please?

Q.  Of course.

A.  "Please stop abusing these horses.  They did nothing to, and you are abusing these horses with your money.  Please stop doing that."  I find that that would be more confrontational than somebody saying, "Hey, can I talk to you about maybe taking your kids to this sanctuary where they can pet, like, happy animals and see animals versus them being all depressed and being abused at this facility."

I find that my style is more confrontational just

because of the elevated voice and almost, I guess, much less friendly style than Zohra's is.

Q.  And generally, what impact do you think your style had on -- well, who was the target of your protest?

A.  I was -- I was trying to mostly address the parents who were bringing their kids there.

Q.  And what impact do you think your style had on them?

A.  Well, so I would -- I would very often, during my speak (sic), would say, "Hey, if you guys -- if your kids like animals, that's why you bring your kids here. If you want them to interact with happy animals, take them to a sanctuary."  But I wouldn't be, like, talking one-on-one with the person, I would be addressing the whole group in general; hence my elevated voice and signs and stuff.

Whereas Zohra would say similar things like, you know, "These horses are being abused here.  Maybe if you want to take your kids just to interact with happy animals, maybe you could go here instead."  When I would say it to the overall group, to the paid customer's, versus she would be one-on-one with individuals.

Q.  And what was your ultimate goal with your protests at the pony rides?

**Exhibit 6-11**

A.   Yes.

Q.   And in what way did they do that?

A.   By telling me that "Hey.  We're not doing anything.  We're not abusing these horses.  These horses are happy.  So, stop.  Go -- go to -- " basically by, kind of, counteracting what I was saying and I saying "You have no reason to be here.  Let us do our own thing."

Q.   And there were commonly -- there were children within the proximity of you when you were protesting, correct?

A.   Of course, yes.

Q.   And were you ever concerned about the impact that your conduct was having on the children?

A.   Not really because I was -- I was -- even though my voice was elevated, I was courteous in what I was saying.  I would say, "Please stop abusing these horses. Don't look them in the eyes.  They haven't done anything to you.  Why are you doing this?  Do they look happy to you?"  That kind of a thing.  And the only thing I saw, really, kids do was, like, talk to their parents.  "Hey, mom, like, what is happening here?"  That kind of a thing.

Q.   Do you think that the children were able to understand the, sort of, specifics of your message or

**Exhibit 6-12**

ponies?

Q.  So you were only yelling at the kids on the ponies?

A.  I wasn't yelling at them, I was -- I wasn't yelling, period.  I was just elevating my voice to make sure that the parents heard me, what I was saying.

Q.  What's the difference between elevating and yelling?

A.  Well, yelling is more -- is more -- is more angry.  I was just elevating it was to make sure that the entire group in -- you know, with the ambient sound and being outside and everything.  I was making sure that the entire group of -- in line would hear me.

Yelling, I would say is more -- more angry.  Like you're yelling at somebody because -- how do I say this? Just anger.  Just a level of anger.

Q.  And do you think a child as young as five is able to tell the difference between, as you just described, elevated voice versus yelling?

MR. FRIEDMAN:  Objection.  Speculation.

You can answer.

THE WITNESS:  Yes, because I would use words that were not angry.  I would say "please" or "look them in the eyes."  I wouldn't to say, "What the fuck are you doing?"  That kind of a thing, right.  So I don't think

**Exhibit 6-13**

that I would have been seen as an angry person yelling at them.

BY MR. PERSOFF:

Q.  What about the word "abuse"?

MR. FRIEDMAN:  Objection.  Vague and ambiguous.

THE WITNESS:  Well, so I would -- I would say that "These ponies should be free like you and I, walking around doing their own thing, not being tied down and be made to walk around in circles because this is abuse.  You are abusing these horses because you are not letting them be ponies.  Ponies are usually happy, jumping around, doing their own pony thing, but here they're being tied down and being made to walk around in circles.  They are not happy and they are -- you are basically abusing them by making them being tied down and do these circle walks."

Q.  And so you think your messages would not have scared or intimidated these children?

A.  No.  By any means, no.  And I was aware that there were children there, so I would specifically say things that -- that would -- that would make them, maybe, ask their parents if they needed more explanation, but I would -- I would make sure I was not seen as an angry person yelling at them for sure.

**Exhibit 6-14**

BY MR. PERSOFF:

Q.  Well, let me ask you this, do you think that someone observing your manner of protest with your elevated voice, as you described, could reasonably understand your conduct to be yelling?

MR. FRIEDMAN:  Objection.  Speculation.

THE WITNESS:  I -- I don't.  You asked this earlier, and I said that to me, yelling is -- there's much more anger in the yelling voice than there is in an elevated voice.

BY MR. PERSOFF:

Q.  And I understand that you have the difference in your mind --

A.  Uh-huh.

Q.  -- but could you understand why someone else observing what you were doing would think that what you were doing is yelling?

A.  Well, if -- if I witnessed somebody else doing what I was doing, I would not see that as yelling, right.  So what is in somebody else's mind, how they view some thing, it's kind of speculation, I guess, right?  Me try to figure out, like, what is in your mind, how are you seeing what is happening here versus how I am seeing it.  I don't see it that way, so I guess I don't really see how others would see that same --

**Exhibit 6-15**

BY MR. PERSOFF:

Q. And -- okay. So if your lawsuit -- well, I'll leave it at that.

Do you remember -- do you have a way of figuring out which days you protested elsewhere? Well, let me ask you this: Would your Signal chat reflect days that you protested elsewhere?

A. No, because the Signal chat has an automatically deleting messages feature, so that would have only lasted a month after posting each message.

Q. And did it ever occur to you to have that automatic deletion -- are you capable of changing the automatic deletion setting?

A. Yes.

Q. And did it ever occur to you that -- well, strike that.

And you were using that Signal chat throughout the protests at Griffith Park?

A. Yes.

Q. And do you recall that a government claim was submitted in your name in March of 2022?

A. A government claim?

Q. Are you aware that the steps were taken on your behalf to submit a claim to the City of Los Angeles alleging that your rights were violated in March of

**Exhibit 6-16**

2022?

A.   Yes.

Q.   And did it occur to you that you should remove the automatic deletion feature of the Signal chat at that time?

A.   When -- when that happened, another chat room was formed where messages were not being deleted.

Q.   And where was that -- where is that chat room?

A.   It's also on Signal.

Q.   And so that still exists?

A.   Yes.

Q.   And so you have access to all those messages now?

A.   Yes.

Q.   And so would those messages show what days you attended protests somewhere other than Griffith Park?

A.   No.  They were -- so this is a chat room between plaintiffs.  So once the case was filed, then a new chat room was formed amongst the plaintiffs; whereas the other chat room had all the people that would show up to actions.

Q.   So all the chats in the original one have been deleted?

A.   Correct.

Q.   But your current chat, everything is preserved?

A.   Correct.

Q.   And did you provide those communications to your attorney?

A.   Yes.

Q.   And so is there any other way to tell which days you attended protests at locations other than --

A.   Hold on a second.  Let me go back to your previous question.  I advised him I had it, I didn't actually give it to him yet.

Q.   Okay.  Is there any other way of telling which days you protested at locations other than Griffith Park?

A.   I could probably figure it out, yes.

Q.   Is it fair to say that you only protested at Griffith Park -- well, let me strike that.

Is it fair to say that following the enactment of the posted rules, and when I say "posted rules," you understand what I'm referring to?

A.   Yes.

Q.   Is it fair to say that following the enactment of the posted rules at Griffith Park, the only days you attended protests at Griffith Park were days that you were arrested?

MR. FRIEDMAN:  Objection.  Vague and ambiguous.

THE WITNESS:  So after the new code was

**Exhibit 6-18**

have to this day.

Q. The big sign, though.

A. Yes.

Q. Okay.

A. And this one as well.

Q. So you mentioned that you have communicated with other protesters regarding the Signal chat. Now, you mentioned there were two different groups. The first one which you referenced, did that include anyone who is not currently a plaintiff?

A. Yes.

Q. And what about the current one, does that have anyone who is not currently a plaintiff in it?

A. No.

Q. And do you communicate with any of the other plaintiffs outside of the Signal chat?

A. Very minimally. I mean, sometimes I would, "Hey" -- like sometimes I remember getting an e-mail saying -- from Maria saying, "Hey, what is your current address? It's for this form Jerry asked me to fill out," or whatever. But we're not really in talk, so to speak, right? So very minimal communication.

Q. What about when the protests were going on?

A. It was all over Signal.

Q. So you didn't text anyone directly?

A.   No.

Q.   Did you ever communicate with Zohra Fahim outside of the Signal chat?

A.   Mostly within Signal, maybe a few times outside of it, but I don't recall specifics.

Q.   And what about Heather Wilson.  Do you know Heather Wilson?

A.   Yes.

Q.   And do you ever communicate with her?

A.   Yes.  Also over Signal.  I'm pretty sure it was only over Signal with Heather.

Q.   Do you have the other plaintiffs' phone numbers in your phone?

A.   Some, but not most.

Q.   And is your Signal chat with the other plaintiffs still active?

A.   Yes.

Q.   And do you talk about this case?

A.   Only in terms of -- I mean, at this point, only in terms of legal things, right?  Like sometimes --

          MR. FRIEDMAN:  Let me object.  Privileged. That's going to be a joint defense so don't answer that question.

BY MR. PERSOFF:

Q.   Are you following your counsel's instructions not

**Exhibit 6-20**

to answer?

A.  Yes.

Q.  And have you been in any activism since the pony rides protest?

A.  Yes, but very minimally.  With Direct Action Everywhere a couple of actions, a couple of marches maybe.  Not much, like, aggressive protesting, no.

Q.  You mean aggressive protesting like you did at the pony rides?

A.  Correct.

Q.  And what is -- what was different about the pony rides that you were so involved with this protest in contrast to the others?

A.  Well, I live just a few miles away from there. So it was convenient from that aspect because I didn't have to travel far, but also there was not really, like, a big group running the campaign, organizing things, so I felt more in -- more engaged, I guess, as far as trying to corral everybody versus Direct Action Everywhere is a large organization, so they don't do so much collaboration like, "Hey, has do you guys want to do this protest on this day, or this on -- " they just say "Hey, we're going to do this, take it or leave it," kind of thing.

I was much were engaged, like, personally engaged

**Exhibit 6-21**

REPORTER'S CERTIFICATION

The undersigned Certified Shorthand Reporter of the State of California does hereby certify:

That the foregoing Proceeding was taken before me at the time and place therein set forth.

That the testimony and all objections made at the time of the Proceeding were recorded stenographically by me and were thereafter transcribed, said transcript being a true and correct copy of the proceedings thereof.

In witness whereof, I have subscribed my name, this date:  May 13, 2025.

_____

Certified Shorthand

Reporter For The State of

California 14778

**Exhibit 6-22**